. The opinion of the court was delivered by
Nicholls, C. J.
The only issue before us is as to the amount of compensation allowed. Appellants contend it is entirely too small *1274 .and call our attention to the great difference between the award in the present case and that in the matter of the Morgan Railroad. Counsel on their behalf say: “Considering that one railroad is merely a continuance of the other — that the evidence proceeds on the same lines — the two awards are too far apart for both to receive the sanction of the same court. They can not be explained, even as a difference of opinion, after considering the same elements of value. They can only be explained on the theory that the two juries proceeded on different views of the law. In other words, the present jury did not apply to this case the law as laid down in the Morgan Company case. Hence this case presents not simply a difference of opinion as to a question of fact — the value •of the property appropriated. The insignificant, unprecedentedly low award evidences a mistaken view of the law of the case. Either this, or the jury were influenced by prejudice.
We have carefully examined the evidence in this case in reference to the amount awarded to the defendant company. Quoad that •question the burden is on them to make good their claims. The expropriation proceeding in this suit is of a character different from that with which we are usually called on to deal. Ordinarily such demands have been based on a prayer by a railroad company to obtain a right of way by original expropriation from the owners of the fee. In the case at bar the right of way is sought to be obtained from a railroad which holds its own right of wajq through having itself exercised a right of expropriation, or appropriation or both. In answer to a question propounded by the defendants’ counsel to those of the plaintiffs as to the nature and character of the rights plaintiffs were seeking to acquire herein, they answered they sought the acquisition in part of the fee of the defendants’ right of way •and the acquisition in part of an easement upon it.
It is generally accepted as true that lands devoted to one public •use can not be subjected to another, unless the authority so to do be given in express words or by necessary implication; that the Legislature is not presumed to have intended to allow that this should be done (Lewis on Eminent Domain, Sec. 267). In view of that fact statutes bearing on that-subject must be strictly construed.
In 1880 the General Assembly of Louisiana, by Act No. 124 of that year, enacted that corporations chartered or formed under the laws ,of this State or under the laws of the United States, for the purpose *1275 of transmitting intelligence by magnetic telegraph or telephone or other system of transmitting intelligence the equivalent thereof, may construct, maintain such telegraph, telephone or other lines necessary to transmit intelligence along all State, parish or public roads or public works, and along and parallel to any of the railroads in the State, and along and over the waters of this State, 'provided, that the ordinary use of such roads, works, railroads and waters be not thereby obstructed, and along the streets of any city, with the ■consent of the council or trustees thereof, and such companies shall be entitled to the right of way over all lands belonging to the State, and over the lands, privileges and servitudes of other persons and corporations, and the right to erect poles, piers, abutments and other works necessary for constructing, working, operating and maintaining their lines and works upon making just compensation therefor. That in the event such company shall fail on application therefor to secure such right by consent, contract or agreement upon just and reasonable terms, then such companies or .corporations shall have the right to proceed to expropriate the same as provided in and by the laws of the State relative to expropriation of lands for railroads and other works of public utility, and shall so construct their works as not to impede or obstruct the full use of the highways, navigable waters or the drainage or natural servitudes of the land over which ■the right of way may be exercised.
On the 24th of July, 1866, Congress passed an act entitled “An act to aid in the construction of telegraph lines and to secure to the government the use of the same, for postal, military and other purposes,” by which it was enacted that any telegraph company now organized, or which may hereafter be organized under the laws of any State of this Union, shall have the right to construct, maintain and operate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States which have been or may be hereafter declared such by act of Congress, and over, under and across the navigable streams or waters of the United States, provided, that such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters, or interfere with the ordinary travel on such military or post roads.
In 1872 Congress declared all the railroads in the country which were then or might thereafter be in operation, post *1276 roads. The syllabus of the decision of this court reported in Ante, p. 58, declares that “Act No. 124 of 1880 gives the right to construct a telegraph line over a railroad’s right of way;” that “ the acts of Congress of 1866 and 1872 are on the same subject and give the right to construct a line of telegraph under certain conditions along and over the right of way of railroads, and that the State law was subordinated to these acts, but might' be resorted to for condemnation and compensation.”
What under the laws cited was the character of the right granted? Was it a right to dispossess railroad companies of the fee (if any they had) of a portion of land which they had acquired themselves by expropriation, or was the right limited to an “ easement,” and this right subject to be modified by changing conditions of the railroad companies as to their own necessities? Was it the intention of the lawmaker to make the prior acquired right yield permanently to the last one acquired? Was the latter a fixed right not susceptible of change, or was it a temporary one taken, subject to the paramount, ultimate right of the first company, to be regained and re-exercised in case of necessity.
Lewis (Sec. 267) declares that property not in use for railroad purposes and not necessary to the proper exercise of the corporate franchise may be taken by another company. He says (Sec. 269) that “ a telegraph may be established along a railroad right of way, it being no material interference with the use for railroad purposes,” adding: “ but a special authority to a telegraph company to build upon, over or under any public road, street or highway, is to be construed strictly, and when such new right is given, it must be so exercised as to do as little injury as possible to the old way or road.”
When the whole of the right of way of a railroad is needed longitudinally for railroad purposes, or when grounds, shops and the like, which are devoted to special uses in connection with the road and necessary to its operation and in constant use, in connection therewith, it should not be permitted to be ousted completely from its rights by a newcomer seeking to exercise a franchise of a different character, unless under most extraordinary circumstances, if at all.
We have noticed these general principles as the starting point for an examination of the character of. the right which is to be acquired by the plaintiffs herein, and of the extent it can be permitted *1277 to interfere, either permanently or temporarily, with those of the defendant, inasmuch as the amount of compensation to be awarded will be affected by those facts. We may say, in that connection, that we are by no means certain that the defendants themselves have more than an “ easement” over a large portion of their right of way. The evidence shows that when built, the road was constructed, in large part, over the public lands of the government of the United States, and it is more than likely that most of their right of way is held by “ appropriation” or “ occupancy” instead of by purchase, grant or expropriation — and that defendants have no “ fee” which the plaintiffs could expropriate, even if the law authorized them to do so. Be that as it may, we do not think, under the terms of the laws cited, that more than an easement or right of way was intended to be authorized to be acquired by telegraph and telephone companies over rights of way already appropriated or expropriated. We do not think it was the intention of the lawmaker to abridge the franchises of the corporation already holding possession, or to east affirmative, active duties upon them in respect to telephone lines which might be constructed upon their right of way. We think the lawmaker intended simply to force public corporations holding a right of way by expropriation to permit the use and occupation of a portion of the same, whenever the conditions under which the legal permission to do so was granted and upon which it was based were found to exist, and so long as they should continue to exist. These conditions are “ that the ordinary use of the roads, works, railroads and waters be not thereby obstructed.” We are inclined to believe that should the situation of affairs change subsequently so as to make it necessary for the original corporation in order to carry out their functions and duties to resume the use of the whole or a portion of the right of way which the second company had newly acquired, they could legally do so (unless controlled by special considerations) through proper proceedings and proof and under proper conditions. Qui prior est tempore potior eat jure.
The State government, in the statute quoted, “ granted to telegraph companies, conditionally, the privilege of constructing and maintaining their lines over and along all State, parish and public roads or public works,” and “along and over the waters of the State,” and declared that such companies should be entitled to the “right of way over all lands belonging to the State and over the lands. *1278 privileges and servitudes of other corporations, and the right to erect poles, etc., necessary for constructing, working, operating and maintaining the lines.” There is nothing in the language of this law indicative of an intention of doing more than authorizing a conditional easement or servitude upon defendants’ right of way. The compensation to which defendants are entitled for the use and occupation of a portion of their right of way would vary materially (if that be the character of the right to be acquired by the plaintiffs) from what it would be entitled to if these proceedings were to carry with them to plaintiffs the fee of any portion of defendants’ right of way.
“ Upon the principle,” says Lewis (Sec. 278), “that statutes conferring compulsory powers are to be strictly construed it follows, that where the estate taken is not defined only such estate or interest will vest as is necessary to accomplish the purpose in view. Thus under an authority to take land for a highway, railroad or other use, only an easement can be acquired.” A right of way in legal meaning is a mere easement -on the lands of others. (Am. and Eng. Ency. of Law, Vol. 6, verbo Eminent Domain, p. 531.)
The basis of calculation would be different as between the parties to this suit from what it would be if the plaintiffs were seeking to obtain rights under an original expropriation from the original owners of lands for public purposes.
It would be difficult to ascertain the “ market value ” of the land taken up in the erection of a telephone line over a railroad’s right of way, even if the railroad company held the fee. When once the land which is included in such a right of way has become separated from the different tracts of which it originally formed part, it has practically become hors de commerce as land. The value of the lands from which they have become detached and which border the right of way furnishes a poor basis for determining that within the right of way, as the lacter has ceased to be available for general purposes.
The Civil Code directs the jury of experts, impaneled to assess the value of the land sought to be expropriated, to “ determine by their verdict, after hearing the parties and their evidence, what is the value of the land described in the petition, and what damages, if any, the owner would sustain in addition to the loss of the land by its expropriation ” (0. C. 2622), and declares that “ in estimating the value of the property to be expropriated the basis of assessment *1279 shall be the true value which the land possessed before the contemplated improvement was proposed, without deducting therefrom any amount for the benefit derived by the owner from the contemplated improvement or work” (C. C. 2623).
The articles of the Code on this subject deal obviously with the question of expropriation and assessment as presented in its most’ usual form, and provide no standard where the object of the expropriation is the acquisition by one corporation of a right of way or right of occupation and use over a right of way already acquired by another.
Under such circumstances we are forced to construe the words “ value of the property to be expropriated ” to mean “ value of the; use and occupation of the property to be appropriated.”
The American and English Encyclopedia of Law in referring to-the subject of the measure of damages where they are demanded ‘ ‘ for running powers over another railroad ” declares that it is difficult to arrive at any rule for the computation of damages in such a case.
We find it laid down in that work under the authority of Griswold vs. St. Louis, etc., R. R. Co., 8 Mo. Ap. 582; S. C., 1 Am. and Eng. R. R. Cas. 626, that: “Where the use made of the land is simply temporary the measure of damage is not the full value of the land, but only a fair recompense to the owner for the use made of it and for any injury done to it.” We think the standard there adopted a just one, which can well be taken for the purposes of cases like the present. In determining what a fair compensation should be, the improved condition of the land sought to housed is a proper element in reaching conclusions. (Postal Co. vs. Morgan’s Co., 49 An. 60.) The defendants are not entitled to recover the original cost of improvements, but are entitled to reasonable-remuneration in view of the same. (Am. and Eng. Ency. of Law, Vol. 6, page 558.) In the case at bar plaintiffs’ telegraph poles are proposed to be placed on the outer edge of defendants’ right of way, considerably outside of any portion of the same which the railroad company has now in use, or is likely to call into use in the near future. We think the poles are sufficiently removed from defendants’ track to justify our designating danger from the same as a remote danger, even as to the sidings. The railroad right of way has-been already fenced in (in their own interest) in almost its entire length. Defendants are not called on to make any change in the same *1280 in the interest of the plaintiffs, nor will they be specially called on in interest of the latter to keep their right of way clear of grass to guard plaintiffs’ poles from danger from fire. Railroad companies are under a general obligation to keep their tracks free from combustible materials, but the plaintiffs, in voluntarily seeking to place their line along defendants’ right of way, assume certain risks (C. C. 2323), and also the obligation of taking the necessary steps and precautions for the protection of their own property from fire and for the operation of their line. Defendants’ fear of danger of liability from the presence of the telegraph poles on their line of way is greatly exaggerated, if it exists at all. A proportionate sharing of the expenses necessary for the purpose of keeping the right of way free from grass or undergrowth can easily be made the subject of conventional agreement between the parties, and if it be not so reached they would not stand without remedy. The telegraph poles of the plaintiff company will occupy ground throughout almost the entire length of the right of way claimed, which has never needed nor received improvement at the hands of the defendants. They will be placed, generally, on open, flat prairie land, which has called for no clearing. Defendants thus refer to their expenditures on their line of way for clearing purposes:
“The right of way of defendants over which plaintiff seeks to expropriate a right of way for telegraph purposes is one hundred and five and forty-one one-hundredths miles in length. Of this right of way eighty-six miles pass through agricultural and prairie lands, or urban property, there being numerous towns on the railroad. Thirteen miles are through timbered land not swamp; four and a half miles through timbered swamp, and and one and a half miles through swamps not timbered. These nineteen miles through timbered and swamp lands have been made available for a right of way at a cost of much labor and money and it is kept clear and in suitable condition at a considerable annual expense, its maintenance in this condition being necessary for the proper and safe operation of defendants’ trains.”
“ If plaintiff were not going to avail itself of the work already done by defendants, it would cost four hundred and thirty-six dollars and eighty cents to clear a width of eight feet (the width of the arms of the telegraph poles) through thirteen miles of timbered land not *1281 swamp, and two hundred and sixteen dollars to clear the same width through timbered swamps. In two years time the undergrowth would reach such a height as to interfere with the operation of the telegraph line and the land would have to be recleared every two years at an expense of twenty dollars per mile, or ten dollars per mile per year, or one hundred and seventy-five dollars for the seventeen and a half miles of timbered and timbered swamp land. But this expense of maintenance is saved the telegraph company from the necessity the railroad company is under of keeping its right of way clear and free from undergrowth. From the foregoing it appears that it would cost the telegraph company to do what'has already been done for it to make the seventeen and one-half miles suitable for telegraph right of way, $436.80 x 216, or $642.80. That it is saved a cost of maintenance equal to one hundred and seventy-five dollars per year, which capitalized at five percent, is equivalent to three thousand five hundred dollars.”
“ Is not the value then of the right of way [on that score] over the seventeen and one-half miles worth, at least, three thousand five hundred dollars plus six hundred and forty-two dollars and eighty cents, or four thousand one hundred and forty-two dollars and eighty cents.”
We have reached the conclusion that the amount awarded to defendants is too small and that it should be increased.
For the reasons herein assigned, it is hereby ordered, adjudged and decreed that the judgment appealed from be and the same is hereby amended by ordering and decreeing that the rights described in plaintiffs’ petition be and the same are hereby condemned, expropriated and adjudged to petitioner, the Postal Telegraph Cable Company of Louisiana, as a right of way for the purposes and subject to the conditions set forth and prayed for in said petition, the same to vest in petitioner upon payment by plaintiffs to the defendants of the sum of twenty-one hundred dollars.
It is further ordered, adjudged and decreed that the judgment appealed from, as so amended, be and the same is hereby affirmed, costs of appeal to be paid by the appellees.